UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

PLUMBERS & PIPEFITTERS LOCAL 625;
PLUMBERS & STEAMFITTERS LOCAL 565;
PLUMBERS & STEAMFITTERS LOCAL 83;
and WEST VIRGINIA PIPE TRADES
HEALTH AND WELFARE FUND,

      Plaintiff,

v.                         Civil Action No. 2:18-cv-01097

NITRO CONSTRUCTION SERVICES, INC.,
formerly known as Nitro Electric Company, Inc.,

      Defendant.

## MEMORANDUM OPINION AND ORDER

      Pending are the plaintiffs' motion for partial summary judgment, filed May 13, 2020 (ECF No. 98), the defendant's motion for summary judgment, filed May 27, 2020 (ECF No. 101), and the plaintiffs' motion for leave to file a sur-reply regarding the defendant's motion for summary judgment, filed June 24, 2020 (ECF No. 108).

### I.    Background

      The plaintiffs in this case are an employee health and welfare benefit fund managed by fund trustees (the "Fund") and three local unions—Plumbers & Pipefitters Local 625 ("Local 625"), Plumbers & Steamfitters Local 565 ("Local 565"), and

Plumbers & Steamfitters Local 83 ("Local 83")—whose members are participants in and beneficiaries of the Fund.  See No. 1 at 2; ECF No. 7 at 2–3; ECF No. 98-1 at 2–3.  The defendant is a construction company that has made contributions to the Fund as a participating employer.  See ECF No. 1 at 2; ECF No. 7 at 3; ECF No. 98-2 at 87–104; ECF No. 98-3 at 2-3.

The defendant's contributions to the Fund were made pursuant to collective bargaining agreements with the unions and the Fund's trust agreement.[1]  With respect to the defendant's agreement with Local 625, a portion titled "PAYMENTS TO FUNDS AND PENALTY" states, in pertinent part:

> . . . .  [The defendant] shall pay the contributions
> to the . . . Fund[] monthly on or before the 10th day

---

[1] In its answer, the defendant acknowledged that it is bound by the terms of an agreement with Local 625 but stated that it lacks sufficient documentation or knowledge indicating it agreed to be bound by the terms of any agreement with Local 565 or Local 83.  See ECF No. 7 at 3.  In its summary-judgment briefing, the defendant points out that the agreements proffered by the plaintiffs are un-signed and that one of them is prominently marked with the word "SAMPLE."  See ECF No. 102 at 2 n.2 (citing ECF Nos. 28-1, 28-2, and 28-3).  However, the defendant has not argued that it is entitled to summary judgment, or that the plaintiffs are not so entitled, on the ground that there is no evidence that it is bound by the terms of the proffered agreements.  Additionally, in response to the defendant's assertions, the plaintiffs filed signature pages and related documents indicating the defendant is a signatory to the agreements.  See ECF No. 103.  Thus, not only does the defendant not seek summary judgment on this ground, but the only evidence in the record supports the conclusion that the defendant is bound by the terms of the agreements proffered by the plaintiffs.  The court proceeds with this understanding.

> of each month[,] and failure of [the defendant] to
> make this payment to the . . . Fund[] by the 20th day
> of the month on which payment is due, or for repeated
> failures to meet these payments by the 10th of each
> month shall subject [the defendant] to the following:
>
> Penalty Number One:  A fine for liquidated
> damages set by the Trustees of the . . . [F]und[], for
> the [defendant]'s delinquency.

ECF No. 28-1 at 24-25.

The defendant's agreements with Local 565 and Local 83 likewise point to the trust agreement with the Fund.  The agreement with Local 565 states:

> . . . .  The [defendant] shall pay all
> health and welfare . . . benefit contributions to the
> employee's home Local Union, or to a Local Union
> designated by the International Union so as to provide
> continuous coverage for each employee.  The
> [defendant] hereby adopts and agrees to be bound by
> the written terms of such legally established local
> trust agreements specifying the detailed basis on
> which payments are to be made into, and benefits paid
> out of, such trust funds.

ECF No. 28-3 at 10.  Similarly, a section of the agreement with Local 83 addressing welfare benefit funds states that the defendant "agrees to be bound by and will sign all legally constituted trusts which have been established between Local [83] . . . and recognized bargaining agencies of contractors in the area."  ECF No. 28-2 at 10.[2]

---

[2] As the defendant observes, the agreement with Local 83 also specifies that "[w]elfare funds . . . and other funds required by the Local Union or District Council Labor Agreement shall be paid in accordance with the Local Labor Agreement."  ECF No. 28-

The Fund's trust agreement, to which all three of the collective bargaining agreements point, states that the Fund's trustees "have the power to demand and collect contributions of the [defendant] to the Fund" and to "take such steps, including the institution and prosecution of and intervention in any legal proceeding that may be necessary or desirable to effectuate the collection or preservation of contributions or other amounts which may be owed." ECF No. 28-4 at 48. Pursuant to this authority, the trust agreement states that the defendant "shall be obligated on demand of the Trustees to pay interest at the rate established by the Trustees from time to time . . . on the money due . . . together with all necessary expenses of collection incurred by the Trustees, including, . . . reasonable attorney fees, court costs and fees." Id. at 48–49. The trust agreement also states that the trustees are to adopt "a

---

2 at 10.  The defendant asserts that no "Local Labor Agreement" has been produced in discovery.  See ECF No. 102 at 2 n.2.  But again, the defendant does not argue that it is entitled to summary judgment with respect to Local 83, or that Local 83 is not so entitled, based on the Local Labor Agreement's absence. Nor does the defendant assert that the Local Labor Agreement, if discovered, would alter its obligations set forth in the agreements the plaintiffs have proffered.  To the extent the defendant believes summary judgment is inappropriate without further discovery regarding the Local Labor Agreement, it has not attempted to oppose summary judgment on this ground or to otherwise satisfy the requirements of Fed. R. Civ. P. 56(d). See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954 at 961–62 (4th Cir. 1996).

'Delinquent Employer Procedure' that will set up a standard system to follow in dealing with Employers who are late in making their payments, so as to effectuate the collection of delinquent contributions." Id. at 47.

The Fund's trustees adopted a delinquent employer procedure that was in effect from November 1, 1995, to January 25, 2017. See ECF No. 28-5 at 2; ECF No. 28-6 at 7. According to the procedure, the defendant was to "submit . . . a check for the entire sum of money due the Trust Fund reflected by the Monthly Contribution Report submitted therewith," which was to "reflect[] all hours of work performed by each employee" "for the preceding month." ECF No. 28-5 at 3 (emphasis omitted). The procedure specifies that the "payment is to be submitted . . . on or before the 20th day of the month immediately following the month designated in the Monthly Contribution Report." Id. at 4. If the payment was not received on the due date, the procedures required the Fund's administrator to write the defendant and inform it that its contribution was delinquent and that amounts for interest and liquidated damages would be assessed, which must be received, along with the delinquent contribution, within fifteen days of the defendant's receipt of the notification. See id. The interest was to be "calculated at the rate of 1% per month, of the total amount due," and the

liquidated damages were to be "calculated at a rate of 10% for the first month said payment is delinquent." Id. at 5.  If the amounts were not received within the fifteen-day period, the Fund's administrator was to notify the Fund's attorney, who, in turn, was to provide the defendant another letter informing it that, "if the contributions, interest and liquidated damages and attorney['s] fees are not [timely] paid" within another fifteen days, he was authorized to seek "damages permissible under the TRUST AGREEMENT" in a lawsuit. Id. at 5–6.

The Fund's trustees adopted a delinquent contribution policy that replaced the delinquent employer procedure and applies to contributions made on or after January 26, 2017. See ECF No. 28-6 at 7.  Like the replaced procedure, the policy specifies that "[c]ontributions and the supporting remittance report . . . are due no later than the 20th day of the month following the month in which the work was performed." Id. at 3. If a contribution is not received by the due date, the Fund's administrator is to "send a notice of delinquency to the [defendant] requesting immediate payment of the [c]ontribution[] due plus liquidated damages," which are "calculated at 10% for the first month said payment is delinquent," and "assess interest on the delinquent [c]ontribution[] at the rate of 1% per month." Id.  "If the delinquent [c]ontribution[], interest

and liquidated damages are not received . . . by the last day of the month following the month in which contributions are due," the Fund's administrator is to "send a second notice assessing additional interest charges on the unpaid contributions at the rate of 1% per month."  Id.  If outstanding amounts are not received by the twentieth day of the next month, the Fund's administrator is to notify the Fund's attorney, who is to send a letter to the defendant demanding payment.  See id. at 3–4.  If payment is not received within fifteen days after the letter is sent, the Fund's attorney can initiate legal action in the form of a lawsuit.  See id. at 4.  The policy also specifies that attorney's fees are to be assessed against the defendant for any legal action the Fund's attorney institutes for collection efforts.  See id. at 6.

This matter concerns contribution payments the defendant submitted to the Fund with respect to the three unions between June 2016 and August 2017.  See ECF No. 1 at 3.  There appears to be no dispute that the defendant submitted payments for the full amounts of those contributions before this suit was filed, see ECF No. 28-7 at 8-25; see also ECF No. 106 at 4–5, but there also appears to be no dispute that at least some of those contribution payments were late, see ECF No. 28-7 at 6–7; ECF No. 101-3.  However, other factual disputes remain

regarding, for instance, if and when the defendant was notified that the payments were late.  See ECF No. 28-7 at 8—25; ECF No. 101-2 at 1—2, 6.

By October 2017, the defendant had been made aware that the Fund had assessed liquidated damages and interest against it based on late contribution payments.  See ECF No. 101-2 at 1-2, 6.  The defendant appealed the assessments to the Fund's trustees on October 25, 2017, but the trustees denied the appeal.  See id.

In June 2018, the plaintiffs filed suit against the defendant pursuant to § 301 of the Labor Management Relations Act ("LMRA")[3], 29 U.S.C. § 185.  See ECF No. 1 at 1.  Under § 301, "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U.S.C. § 185(a).  The plaintiffs allege that the defendant is obligated by the collective bargaining agreements with the unions to make timely contributions to the Fund and that the defendant made late

---

[3] The LMRA is also often referred to as the Taft-Hartley Act.

contributions.  See ECF No. 1 at 3.  They allege that the defendant "is liable for [the] failure to make timely . . . contributions pursuant to 29 U.S.C. § 185(a) and under the Collective Bargaining Agreements."  Id. at 2.  They further allege that the defendant's failure pay the liquidated damages and interest assessed for the late contributions violated the terms of the collective bargaining agreements and the trust agreement.  See id. at 3.  Accordingly, the plaintiffs seek judgment in the amount of the assessed liquidated damages and interest as well as attorney's fees.  See id. at 4.

## II.  Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

"'When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" <u>Arch Ins. Co. v. Berkley Nat'l Ins. Co.</u>, 399 F. Supp. 3d 571, 574 (S.D.W. Va. 2019) (internal quotation marks omitted) (quoting <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003)).  "'When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" <u>Id.</u> (internal quotation marks omitted) (quoting <u>Rossignol</u>, 316 F.3d at 523).

### III. Discussion

#### A. <u>The defendant's motion for summary judgment</u>

The defendant organizes its summary-judgment briefing according to the different types of relief the plaintiffs seek. The court does the same.

##### (1)  Liquidated damages

###### a. Applicable law

As the defendant correctly asserts, federal common law applies to claims brought pursuant to § 301 of the LMRA.  <u>See</u> <u>Barton v. House of Raeford Farms, Inc.</u>, 745 F.3d 95, 107 (4th

Cir. 2014) (citing McCormick v. AT & T Techs., Inc., 934 F.2d
531, 534 (4th Cir. 1991) (en banc)).  Under federal common law,
liquidated-damages provisions that are penal in nature are
unenforceable.  See In re Apex Express Corp., 190 F.3d 624, 637–
38 (4th Cir. 1999); Bd. of Trs., Sheet Metal Workers' Nat'l
Pension Fund v. DCI Signs & Awnings, Inc., No. 1:08cv15 (JCC),
2008 WL 4329294, at *7 (E.D. Va. Sept. 15, 2008); see also
Restatement (Second) of Contracts § 356 ("[T]he parties to a
contract are not free to provide a penalty for its breach.  The
central objective behind the system of contract remedies is
compensatory, not punitive.").[4]

        Under federal common law, a challenged liquidated-
damages provision "must meet two conditions for enforceability":
(1) "the harm caused by a breach must be very difficult or
impossible to estimate," and (2) "the amount fixed must be a
reasonable forecast of just compensation for the harm caused."
Idaho Plumbers & Pipefitters Health & Welfare Fund v. United
Mech. Contractors, Inc., 875 F.2d 212, 217 (9th Cir. 1989); see
also Wise v. United States, 249 U.S. 361, 365 (1919);

-------------------------------------------------

[4] "Federal courts use the Restatement of Contracts in determining
federal common law of contracts."  Doral Bank PR. v. Fed. Home
Loan Mortg. Corp., 477 F. App'x 31, 39 n.8 (4th Cir. 2012)
(citing In re Peanut Crop Ins. Litig., 524 F.3d 458, 470 (4th
Cir. 2008)).

_Bricklayers Pension Tr. Fund v. Rosati, Inc._, 187 F.3d 634, 1999 WL 503501, at *2 (6th Cir. 1999) (unpublished table decision); _United Order of Am. Bricklayers & Stonemasons Union No. 21 v. Thorleif Larsen & Son, Inc._, 519 F.2d 331, 332 (7th Cir. 1975); Restatement (Second) of Contracts § 356, cmt. b.  The Fourth Circuit has applied this same two-part test to determine if liquidated-damages provisions amount to unenforceable penalties, albeit not in the context of an LMRA claim.  See _Doral Bank_, 477 F. App'x at 39–40; _Bos. Iron & Metal Co. v. United States_, 55 F.2d 126, 128 (4th Cir. 1932).[5]  Although the Fourth Circuit has not applied the federal common law rule regarding punitive liquidated-damages provisions or the two-part test specifically in the LMRA context, the court is persuaded that is the correct approach here.[6]

_____

[5] Notably, some of the cases from other circuits in which the federal common law rule is applied involve claims, like the one here, brought under § 301 of the LMRA by an employee trust fund or a labor union seeking to enforce liquidated-damages provisions in collective bargaining agreements against an employer that has made late contributions.  See _NW Ironworkers Ret. Tr. v. United Steel Inc._, 902 F.2d 1579, 1990 WL 66327, at *1–2 (9th Cir. 1990) (unpublished table decision); _Idaho Plumbers_, 875 F.2d at 214; _Larsen & Son_, 519 F.2d at 332.

[6] When faced with gaps in otherwise comprehensive federal statutes, federal "courts can resolve interstitial questions of federal law either by formulating a federal common law rule or by adopting existing state law, and . . . they must choose between these two courses on a statute-by-statute, issue-by-issue basis."  _Kendall v. City of Chesapeake_, 174 F.3d 437, 441 n.1 (4th Cir. 1999) (citing _United States v. Kimbell Foods,_

The plaintiffs do not appear to contest the applicability of federal common law or the two-part test, but they do advance arguments that attempt to diminish the potency of the federal common law's anti-penalty rule. The plaintiffs point out that, in 1980, Congress amended the Employment Retirement Income Security Act ("ERISA") in response to the "substantial number of employers [that] had failed to make their 'promised contributions' on a regular and timely basis." Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc., 484 U.S. 539, 546 (1988). As amended, § 515 of ERISA requires employers that are obligated to contribute to a plan pursuant to a collective bargaining agreement to do so in accordance with the agreement's terms. See 29 U.S.C. § 1145. To enforce this requirement, § 502(g)(2) of ERISA provides special remedies against delinquent employers, including, among other things, mandatory liquidated damages in an amount typically not to exceed twenty percent. See 29 U.S.C. § 1132(g)(2); Laborers Health & Welfare, 484 U.S. at 547. Importantly, however, § 505(g)(2)'s special remedies expressly apply only to claims involving unpaid contributions, not claims, such as those here, involving late contributions that were fully

---

Inc., 440 U.S. 715, 727–29 (1979)). Here, even if the court were to consult West Virginia law—the only other potentially applicable law—the result would be the same. See Wheeling Clinic v. Van Pelt, 453 S.E.2d 603, 608–09 (W. Va. 1994).

paid prior to suit.  See Operating Eng'rs Local 139 Health
Benefit Fund v. Gustafson Constr. Corp., 258 F.3d 645, 654–55
(7th Cir. 2001); Idaho Plumbers, 875 F.2d at 215; Carpenters &
Joiners Welfare Fund v. Gittleman Corp., 857 F.2d 476, 478 (8th
Cir. 1988); Trs. of Glaziers Local 963 Pension, Welfare, &
Apprentice Funds v. Walker & Laberage Co., Inc., 619 F. Supp.
1402, 1405 (D. Md. 1985).  For claims brought under the LMRA for
late contributions, § 506(g)(2)'s remedies do not apply, and
contractual liquidated damages may be awarded only if they are
not penalties under federal common law.  See Idaho Plumbers, 875
F.2d at 215–18.

          The plaintiffs recognize the distinction between ERISA
claims involving unpaid contributions and LMRA claims involving
late contributions and concede that ERISA does not apply to
their claim.  See ECF No. 106 at 4–5.  However, the plaintiffs
argue that courts "routinely uphold contractual liquidated
damages provisions" for claims not covered by ERISA's §
506(g)(2) "in light of the overarching federal policy" embodied
by that statute.  Id. at 5.  For support, the plaintiffs cite
Operating Engineers, in which the Seventh Circuit stated that §
506(6)(2) "provides guidance to what is a reasonable remedial
scheme" even where the statute is "inapplicable" because the

contributions at issue were "made before the suit was filed." 258 F.3d at 655.

The court is not persuaded by the reasoning in Operating Engineers.  Although, in that case, the Seventh Circuit took note of the federal common law's "ban on contractual penalties," it largely dismissed the ban as "antiquated" and not in keeping with its own view that contractual penalty provisions should be permitted.  Id.  It is clear that the Operating Engineers court viewed § 506(g)(2) as useful in non-§ 506(g)(2) contexts not because it provides guidance in distinguishing between punitive and compensatory remedies, but because it provides some basis, in the Seventh Circuit's view, for disregarding the punitive-compensatory distinction altogether.  This view is not compatible with Fourth Circuit precedent.  As already explained, the Fourth Circuit applies federal common law to claims brought pursuant to § 301 of the LMRA, and, under federal common law, courts will not enforce punitive liquidated-damages provisions.  See Barton, 745 F.3d at 107; In re Apex Express, 190 F.3d at 637–38; McCormick, 934 F.2d at 534.  Beyond this, Operating Engineers provides good reason for the court to be hesitant to rely on § 506(g)(2) for guidance here:  In the Seventh Circuit's view, § 506(g)(2)'s remedies, including the mandatory liquidated-damages, are

statutory penalties, not intended to approximate actual, compensatory damages.  See 258 F.3d at 654.  To the extent § 506(g)(2)'s remedies are punitive, contractual remedies purposely keyed to § 506(g)(2) should, if anything, engender more, not less, suspicion of also being punitive.

The plaintiffs' reliance on the district court's decision in Glaziers is also unavailing.  Based on legislative history, the Glaziers court concluded that § 506(g)(2) "was enacted to provide stiffer sanctions against employers who fail to make contributions to the employee benefit plans specified in the various collective bargaining and trust agreements to which they are parties" and that, through § 506(g)(2), "Congress intended to strengthen the enforcement provisions of federal pension law to protect the integrity and insure the continued viability of multiemployer employee benefit plans by relieving the plans of the burden of collection proceedings."  619 F. Supp. at 1404.  Although the Glaziers court noted that the late contributions at issue in the case were paid prior to its commencement and thus were not governed by § 506(g)(2), the court nonetheless enforced the contractual liquidated-damages provision without considering whether they were punitive in nature.  Id. at 1405.

To the extent that Congress, in enacting § 506(g)(2), formulated a policy to incentivize prompt contribution payments, Congress limited the statute's reach, as well the implementation of any policy embodied in the statute, to claims for unpaid contributions.  Certainly, § 506(g)(2) "serves the goal of promoting prompt payment; however, [courts] are not at liberty to go farther in serving this laudable goal than Congress chose to go in enacting the [statute]." Carpenters & Joiners, 857 F.2d at 479 n.4 (citing Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp., 474 U.S. 361, 373–74 (1986)); see also First S. Prod. Credit Ass'n v. Farm Credit Admin., 926 F.2d 339, 346 (4th Cir. 1991) ("[W]e are not inclined to ignore the plain language of the statute in order to effectuate what [parties] claim to be the overarching purpose of Congress.").

In sum, the court will not enforce the liquidated-damages provisions at issue here merely because they might be permissible if this case were governed by § 506(g)(2).  The federal common law applies, and the liquidated-damages provisions' validity turns on whether they are punitive.

b. Burdens

The parties dispute which of them bears the burden of proving whether the liquidated-damages provisions are or are not punitive.  The plaintiffs point to a strain of cases applying

federal common law, often in the government-contracts settings,
or federal admiralty law, which state that "[a] party
challenging a liquidated damages [provision] bears the burden of
proving the [provision] unenforceable." DJ Mfg. Corp. v. United
States, 86 F.3d 1130, 1134 (Fed. Cir. 1996) (citing, inter alia,
Farmers Export Co. v. M/V Georgis Prois, 799 F.2d 159, 162 (5th
Cir. 1986)); see also Int'l Marine L.L.C. v. Delta Towing,
L.L.C., 704 F.3d 350, 354 (5th Cir. 2013); cf. Wise, 249 U.S. at
367 (noting "[t]here is nothing . . . in the record to indicate
that the parties did not take into consideration, when
estimating the amount of damage which would be caused by delay,"
the possibility that the particular delay might occur).  The
defendant, however, points to another line of cases, mostly out
of the Ninth Circuit and involving employee benefit plans, which
might be read to suggest the burden is on the party seeking to
enforce a liquidated-damages provision to prove it is not
punitive under at least some portion of the two-part test
outlined above.  See Parkhurst v. Armstrong Steel Erectors,
Inc., 901 F.2d 796, 798 (9th Cir. 1990) ("Without some
indication that the liquidated damages provision is a good faith
attempt to set an amount reflective of anticipated damages, we
will find the provision void as a penalty." (citing Idaho
Plumbers, 875 F.3d at 217)); accord NW Ironworkers, 902 F.2d
1579, 1990 WL 66327, at *1); see also Bd. of Trs. v. Udovch, 771

F. Supp. 1044, 1050 (N.D. Cal. 1991) ("[T]he burden is on
plaintiffs to show that the figure they selected was the product
of a good faith effort to forecast only the otherwise
uncompensated harms they would suffer . . . ." (emphasis
omitted)); accord Chi. Dist. Council of Carpenters Pension Fund
v. Indus. Erectors, Inc., 840 F. Supp. 1248, 1258 (N.D. Ill.
1993).

        The court need not comprehensively determine the
parties' burdens of proof on this issue.  It is sufficient for
purposes of summary judgment in this case to conclude that the
plaintiffs bear the burden to show that the method of
calculating liquidated damages that the Fund selected was the
result of a good-faith effort to set an amount reflective of the
damages anticipated from late payments.

        The court reaches this conclusion for two related
reasons.  First, this burden is in accord with the evolving
jurisprudence regarding the enforceability of liquidated-damages
provisions.  Prior to the twentieth century, such provisions
were disfavored by the courts and were almost always treated as
unenforceable penalties.  See Wise, 249 U.S. at 365–66; United
States v. Bethlehem Steel Co., 205 U.S. 105, 119 (1907).  As
explained in Wise, however, the "modern" view is that "effect
will be given to the provision, as freely as to any other," so

19

long as the two-part test discussed above—i.e., that (1) "the damages are uncertain in nature or amount or are difficult of ascertainment" and (2) "the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss as to show that compensation was not the object aimed at"—is met. 249 U.S. at 365. The reason "the courts became more tolerant of such provisions," Bethlehem Steel, 205 U.S. at 119, is that "[t]here is no sound reason why persons competent and free to contract may not agree upon this subject as fully as upon any other, or why their agreement, when fairly and understandingly entered into with a view to just compensation for the anticipated loss, should not be enforced," Wise, 249 U.S. at 365. Thus, while not necessarily "favor[ed]," liquidated-damages provisions are enforced "when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights." Id. at 366; see id. at 366–67 ("The parties to the contract, with full understanding of the results of delay and before differences or interested views had arisen between them, were much more competent to justly determine what the amount of damage would be . . . ."). Because the very basis for permitting the enforcement of a liquidated-damages provision is that it can represent a deliberately negotiated agreement by the parties to estimate the damages of breach ex ante, it makes sense to

require the proponent of the provision to demonstrate at least
that the provision was, in fact, deliberately negotiated (or
selected, see infra) in good faith to account for anticipated
damages from breach.

Second, placing this burden on the party seeking to
enforce a liquidated-damages provision is especially appropriate
where, as here, it appears that the method for calculating the
liquidated damages is derived not from arms-length negotiation
between the parties but by the unilateral selection of the
provision's proponent. See ECF No. 28 at 5–6 (explaining that
the Fund executed the delinquent employer procedure and later
adopted the delinquent contribution policy). In such
circumstances, the rationale for permitting liquidated-damages
provisions—i.e., that they result from agreements "fairly and
understandingly entered into" by "parties who have equality of
opportunity for understanding and insisting upon their rights,"
Wise, 249 U.S. at 365–66—is greatly diminished. And, without
the adverse party's involvement, the potential for the drafting
party to abuse the provision for punitive purposes is greatly
increased. Accordingly, it again makes sense to require the
provision's proponent to at least show that it selected a method
of calculating liquidated damages in good faith to account for
anticipated damages. See Pacheco v. Scoblionko, 532 A.2d 1036,

1039 (Me. 1987) (assigning burden of proof to liquidated-damages provision's proponents in part because they were "the drafters of the contract").

### c. Application

The defendant argues that the plaintiffs have not proffered any evidence that would satisfy their burden.  The defendant first raised this argument in its motion for summary judgment and reiterated much of the argument in its reply brief.  See ECF No. 102 at 11, 13–14; ECF No. 107 at 8–11.  The defendant points out that, although the plaintiffs have the burden to show they made a good faith attempt to estimate anticipated damages at the times the liquidated-damages provisions were drafted, see ECF No. 102 at 14 (citing Parkhurst, 901 F.2d at 798; Udovch, 771 F. Supp. at 1050), nothing in the delinquent employer procedure or delinquent contribution policy demonstrates the Fund considered estimating damages at the times it adopted them, see id. (citing ECF No. 28-5; ECF No. 28-6).  Further, the defendant points out that the heavily-redacted minutes for the meeting in which the Fund adopted the delinquent contributions policy contains no indication as to why the Fund selected the method of calculation that it did.  See id. (citing ECF No. 101-1).

In their response, the plaintiffs assert that the liquidated-damages provisions employed in this case are reasonable forecasts of anticipated damages because they fall under the twenty percent figure for liquidated damages applied to unpaid contributions set by Congress to protect the viability of employee benefit plans in § 506(g)(2). See ECF No. 106 at 11–12, 15–16.  The plaintiffs also argue the provisions are reasonable given the inherent difficulty of estimating the multiple kinds of harm caused by late contributions, as described in the affidavit of the Fund's third-party administrator ("TPA").  See id. at 12–15 (citing ECF No. 105 at 1–4).  Finally, in their proposed sur-reply, the plaintiffs argue that, to the extent they are required to prove that "the liquidated damages provision evinces a good faith attempt to set an amount reflective of anticipated damages," they have done so by proffering their TPA's affidavit, which "states that the liquidated damages provision 'is designed to ameliorate, if not totally offset,' the . . . harms sustained by the Fund."  ECF No. 108-1 at 7 (quoting ECF No. 105 at 4).

The court agrees with the defendant.  Nothing in the language of either the delinquent employer procedure or the delinquent contributions policy offers any hint that the Fund made a good faith attempt to estimate anticipated damages from

late contributions at the times the documents were drafted or adopted.  Likewise, the meeting minutes regarding the adoption of the delinquent contributions policy—the only contemporaneous record evidence of the Fund's understanding with respect to a liquidated-damages provision—is silent regarding the Fund's reasons for adopting the policy.

The court is not persuaded by the plaintiffs' arguments.  First, as the court has explained <u>supra</u>, the mere fact that a liquidated-damages provision might pass muster under § 506(g)(2) does not <u>ipso facto</u> mean that it is not punitive.  <u>See</u> <u>Bd. of Trs. of Local 41, Int'l Brotherhood of Elec. Workers Health Fund v. Zacher</u>, 771 F. Supp. 1323, 1334 (W.D.N.Y. 1991) (rejecting argument that, by enacting § 506(g)(2), Congress determined that any liquidated-damages assessment not exceeding twenty percent was enforceable as a matter of law); <u>id.</u> at 1334–35 (explaining that federal common law's two-part test "requires scrutiny of the facts and circumstances of each case" and that blanket approval of all assessments not exceeding twenty percent "would ignore the necessary case specific inquiry").  Rather, the provision must satisfy the two-part test under federal common law, pursuant to which it is the plaintiffs' burden to demonstrate that the provision is the result of a good-faith effort to estimate the anticipated damages from breach.

Second, the evidence that the plaintiffs present demonstrating that the types of harm potentially caused by late contributions are inherently difficult to estimate does not satisfy its burden.  This is true as a doctrinal matter because the mere fact that estimating the harm may be difficult does not relieve either party of the obligation of at least attempting an estimation in good faith.  See Idaho Plumbers, 875 F.2d at 217 ("[The parties] must make a good faith attempt to set an amount equivalent to the damages they anticipate." (citing Larsen & Son, 519 F.2d at 333)).

It is also true as an evidentiary matter.  The evidence the plaintiffs present is the affidavit of the Fund's TPA, who describes the myriad harms that could befall the Fund from late contributions.  See ECF No. 105 at 1–4.  But this affidavit is from June 2020, see id. at 5, and, in it, the TPA never asserts that the harms he identifies were considered years ago when the Fund drafted and adopted the liquidated-damages provisions at issue.  When considering the enforceability of such provisions, however, the courts look to the parties' reasons at the time the provisions were implemented, not to post hoc rationalizations.  See Priebe & Sons v. United States, 332 U.S. 407, 412 (1947) ("These provisions are to be judged as of the time of making the contract." (citing Bethlehem Steel, 205

U.S. at 121));  NW Ironworkers, 902 F.2d 1579, 1990 WL 66327, at
*1 (requiring provision's proponent "to show that there was a
good faith attempt to set an amount reflective of anticipated
damages at the time of the execution of the collective
bargaining agreement" (internal quotation marks omitted));
Udovch, 771 F. Supp. at 1048 (explaining that courts should
"focus . . . on the character of the process that led, at the
time the contract language was drafted, to the fixing of the
liquidated damages figures or formulas").

        Similarly, the TPA's sworn statement that the
liquidated-damages provision "is designed to ameliorate, if not
totally offset," the harms caused by late contributions, ECF No.
105 at 4, does not aid the plaintiffs.  It is not reasonable to
infer from this brief statement alone that, at the time the
provisions were drafted and adopted, the Fund considered the
potential harms the TPA identifies in his affidavit.  The TPA's
affidavit does not state or fairly imply that the Fund did so.

        In sum, the plaintiffs have not met their burden to
show that the liquidated-damages provisions the Fund selected
were the result of good-faith efforts to set an amount
reflective of the damages it anticipated from late contribution
payments.  Thus, under federal common law, the liquidated-
damages provisions at issue in this case amount to unenforceable

penalties.  The defendant is entitled to summary judgment with respect to the plaintiffs' claim for liquidated damages.[7]

    (2)  Interest

        The defendant argues next that it is entitled to summary judgment on the plaintiffs' claim for interest based on its assumption that the combination of interest payments and liquidated damages required by the delinquent employer procedure and the delinquent contributions policy amounts to an impermissible double recovery which renders the interest payment an unenforceable penalty.  See ECF No. 102 at 15 (citing All. Elec., Inc. v. Local Union No. 98, No. 91-6892, 1992 WL 358072 (E.D. Pa. Oct. 20, 1992)).

        The defendant has not argued that interest would be unenforceable as a penalty or otherwise in the absence of

---

[7] The defendant also argues that the liquidated-damages provision in its agreement with Local 625 is an unenforceable penalty because the provision refers to liquidated damages as a "[p]enalty" and a "fine."  ECF No. 28-1 at 24–25.  Similarly, the defendant argues that the liquidated-damages provisions contained in all the relevant agreements, the delinquent employer procedure, and the delinquent contributions policy are all unenforceable penalties because the plaintiffs' briefing consistently refers to them as "penalties."  See, e.g., ECF No. 99 at 2 ("The Plaintiffs instituted this action against [the defendant] to recover liquidated penalties . . . .").  Because the court concludes that the defendant is entitled to summary judgment on liquidated damages on a different ground, the court does not address these arguments.

liquidated damages.[8]  Because the court has determined that the defendant is entitled to summary judgment on the liquidated damages claim, the defendant has not shown that it is entitled to summary judgment on the claim for interest.

        (3)  Attorney's fees

        The defendant's arguments concerning the plaintiffs' claim for attorney's fees involves the interpretation of the trust agreement as well as the delinquent employer procedure and the delinquent contributions policy adopted thereunder.  In their briefing on the issue, the parties do not address the applicable law regarding the interpretation of the agreement or documents adopted thereunder.  As previously explained, federal common law applies to suits, like this one, brought under § 301 of the LMRA.  See Barton, 745 at 107 (4th Cir. 2014); McCormick, 934 F.2d at 534.  Under federal common law, a choice-of-law provision in the kind of agreement at issue in this case generally is enforced absent circumstances not present here. See Cohen v. Ind. Blue Cross, 820 F. Supp. 594, 601 (D.N.J.

---

[8] In its reply brief, the defendant compares the rate of interest applied by the delinquent employer procedure and the delinquent contributions policy to the market rate, the rate discussed in Alliance Electrical, and to rates established by West Virginia statute or the Supreme Court of Appeals of West Virginia.  See ECF No. 107 at 17–18 & n.7.  However, the defendant does not seek summary judgment based on these comparisons.

2011); see also Snow v. Citibank, N.A., No. 5:14-cv-59-FL, 2015 WL 799543, at *5 (W.D.N.C. Feb. 25, 2015).  The trust agreement states that "[i]t shall . . . be construed . . . according to the law of the State of West Virginia to the extent that such laws are not preempted by the laws of the United States."  ECF No. 28-4 at 3.  In the § 301 context, federal law preempts West Virginia law to the extent that the interpretation of the trust agreement is governed by federal common law.  See DCI Signs & Awnings, 20018 WL 4329294, at *7 (citing Allis-Chalmers, 471 U.S. 202, 205 (1985)).  Under federal common law, as applied in this context, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent."  M & G Polymers USA, LLC v. Tackett, 574 U.S. 427, 435 (2015).

The defendant first attempts to distinguish between fees sought under the delinquent employer procedure in effect until January 25, 2017, and the fees sought under the delinquent contributions policy that became effective on January 26, 2017. The defendant appears to argue that the delinquent employer procedure does not authorize the Fund to recover attorney's fees for collecting late contributions.  However, as the plaintiffs correctly point out, the delinquent employer procedure authorizes the Fund's attorney to seek "damages permissible

under the TRUST AGREEMENT" in a lawsuit "if the contributions, interest and liquidated damages and attorney['s] fees are not [timely] paid."  ECF No. 28-5 at 5-6.  In the court's view, this language unambiguously permits the Fund's attorney to seek attorney's fees for collecting late contributions, and, more importantly, it certainly does not prohibit him from seeking such fees pursuant to the terms of the trust agreement.

The defendant next argues that the trust agreement does not allow the Fund to recover attorney's fees for collecting late contributions, at least for the period covered by the delinquent employer procedure.  In a section concerning the "[c]ollection and [e]nforcement of [p]ayment[s]," including late contributions, the trust agreement provides that the defendant "shall be obligated on demand of the Trustees to pay . . . all necessary expenses of collection incurred by the Trustees, including . . . reasonable attorney['s] fees."  ECF No. 28-4 at 48-49 (emphasis added).  The defendant contends that, because the trust agreement specifies that the trustees are entitled to attorney's fees, the Fund itself is not so entitled.

The court rejects this argument.  Under the trust agreement's terms, the trustees have the authority to collect contribution payments "or other amounts" owed to the Fund,

including through the initiation of lawsuits, only "in their fiduciary capacities." Id. at 48 (emphasis added). It is under this general grant of authority that the trustees may demand that employers like the defendant pay attorney's fees. See id. at 49. Further, the trustees have the sole authority to initiate lawsuits for the Fund, see id. at 30, 34, and to hold all the Fund's assets in trust for the Fund, see id. at 46–47. Consequently, any attorney's fees recovered by either the trustees or the Fund in efforts to collect late contributions will necessarily be held by the trustees in trust for the Fund. In short, under the terms of the trust agreement, attorney's fees owed to the trustees are, in effect, owed to the Fund.

Lastly, the defendant argues that it is entitled to summary judgment on the attorney's-fees claim to the extent the plaintiffs incurred the fees while pursuing liquidated-damages or interest claims for which the defendant is entitled to summary judgment. See Idaho Plumbers, 875 F.2d at 218 (holding provision that awards "fees incurred in the collection process" "does not apply" when the employer "owed nothing"). The plaintiffs do not contest the issue, and the court agrees with the defendant. Accordingly, the defendant is entitled to summary judgment as to the portion of the plaintiffs' claim for

attorney's fees relating to their efforts to collect liquidated damages.

B. <u>The plaintiffs' motion for partial summary judgment</u>

The plaintiffs seek summary judgment only on the issue of liability.  Their argument is straightforward.  They contend that taken together, the trust agreement, the agreements with the unions, the delinquent employer procedure, and the delinquent contributions policy require the defendant to pay liquidated damages and interest on any late contributions and to pay attorney's fees incurred in collecting these amounts; that there is no dispute the defendant made late contributions, and the plaintiffs incurred attorney's fees collecting amounts owed; and that, consequently, the defendant is liable for liquidated damages, interest, and attorney's fees.  Given the simplicity of the argument, the plaintiffs devote much of their briefing to addressing the various defenses the defendant raised in its answer to the complaint, <u>see</u> ECF No. 7, as does the defendant. The court likewise addresses the motion according to the defenses, grouping them as the defendant does in its briefing.[9]

_____

[9] The defendant's first defense in its answer asserts that the plaintiffs' complaint fails to state a claim and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  <u>See</u> ECF No. 7 at 1.  The second "defense" simply sets forth the defendant's answers to the complaint's allegations.  <u>See</u> <u>id.</u> at 2–4.  The parties do not address these answers in their briefing, and the

(1)   Penalty defenses (Nos. 3, 5, 6, 8, 15, 16, 18, 19, 20, 29, and 30)

In these defenses, the defendant argues that the liquidated-damages provisions at issue are unenforceable penalties.  The court has already reviewed these arguments in addressing the defendant's motion for summary judgment and concluded that the defendant is entitled to summary judgment on the plaintiff's claim for liquidated damages.  Accordingly, the court will deny the plaintiffs' motion to the extent it seeks summary judgment for liability with respect to liquidated damages.

(2)   Length-of-delinquency defenses (Nos. 4, 7, 9, 26, and 27)

In these defenses, the defendant argues that, according to the language used in the delinquent employer procedure and the delinquent contributions policy, no liquidated damages were to be assessed until a contribution was one month late.  Because the court has already determined that the defendant is entitled to summary judgment on the liquidated-

---

court sees no need to do so.  In its briefing, the defendant lists the twentieth defense as one concerning both its penalty and lack-of-notice arguments.  The court does the same.

damages claim on other grounds, the court need not address this argument.

> ### (3)   Lack-of-notice defenses (Nos. 6, 10, 11, 12, 13, 14, 17, and 20)

In these defenses, the defendant argues that the Fund did not provide notice that the defendant's contribution payments were late.  The defendant points out that the delinquent employers procedure contained a five-step plan to follow for collecting contribution payments.  Step two required the Fund administrator to "write" and "inform" the defendant that a contribution was late, that interest and liquidated damages would be assessed in specific amounts, and that the matter would be referred to the Fund's attorney if the amounts were not submitted within fifteen days.  ECF No. 28-5 at 4.  If the amounts were not submitted within fifteen days, step three required the Fund's attorney to mail the defendant a "certified letter" informing the defendant that it had fifteen days to submit the payment, interest, liquidated damages, and attorney's fees, or else a lawsuit would be commenced.  Id. at 4-5.  Similarly, the delinquent contributions policy requires the Fund administrator to "send a notice of delinquency" to the defendant, requesting the payment, liquidated damages, and interest, if the contribution is not received by the due date.

ECF No. 28-6 at 3.  If those amounts are not received by the end
of the month, the administrator is to "send a second notice"
assessing additional interest.  Id.  If the amounts are not
received by the twentieth day of the next month, the Fund's
attorney is to "send a letter to the [defendant] demanding" the
amounts plus attorney's fees be paid, or a lawsuit would
commence.  Id. at 3-4.

The defendant asserts that a lack of notice precludes
liability for the plaintiffs' interest claim.[10]  The defendant
argues that the provisions laid out in the documents create a
condition precedent to the Fund's ability to file a lawsuit.  "A
condition [precedent] is an event, not certain to occur, which
must occur, unless its non-occurrence is excused, before
performance under a contract becomes due."  Restatement (Second)
of Contracts § 224 & cmt. e.

As the court reads the provisions, they appear to be
akin to notice-and-opportunity-to-cure provisions, allowing
late-contributing employers to avoid assessments for attorney's

---

[10] The defendant also asserts that the lack of notice precludes
liability for the plaintiffs' liquidated-damages claim.  Because
the court has already determined that the defendant is entitled
to summary judgment on the liquidated-damages claim, the issue
here is whether the notice-related defenses the defendant raises
preclude summary judgment for the plaintiffs on their interest
claim.

fees and, in the case of the delinquent contribution policy, additional interest, if they remit outstanding amounts within certain periods.  Such provisions can amount to conditions precedent so long as the language in the agreement expressly says so.  See Robinson v. Delicious Vinyl Record Inc., No. 2:13-cv-04111-CAS(PLAx), 2014 WL 5332854, at *5 (C.D. Cal. Oct. 20, 2014) (citing Clark v. Tide Water Associated Oil Co., 220 P.2d 628, 630 (Cal. Dist. Ct. App. 1950); Hypergraphics Press, Inc. v. Cengage Learning, Inc., No. 08 C 5102, 2009 WL 972823, at *3 (N.D. Ill. Apr. 8, 2009).  And they may act as conditions precedent to a party's ability to commence a lawsuit.  See E. 18th Mgmt. Corp. v. CSC ServiceWorks, Inc., No. 18-CV-4068 (NGG) (RML), 2019 WL 2994447, at *5–6 (E.D.N.Y. July 9, 2019).  A notice-and-opportunity-to-cure provision does not operate as a condition precedent to filing suit when the contractual language demonstrates that the parties intended it to operate as a condition precedent only to some other action.  See IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 403 (S.D.N.Y. 2009).  Further, such a provision does not create a condition precedent to filing suit if other contractual provisions unconditionally authorize lawsuits.  See Alman v. Parkway Mfg., Inc., No. 84-1938-S, 1985 WL 8040, at *1–2 (D. Mass. Jan. 31, 1985).

Here, the court concludes that the delinquent employer procedure and the delinquent contributions policy are conditions precedent to the Fund's ability to file a lawsuit seeking the amounts at issue in this case.  The delinquent employer procedure states that a lawsuit for the amounts shall be commenced "if the [amounts due] are not paid by the [defendant] within the time period provided for in the [Fund's attorney's] letter to the [defendant]."  ECF No. 28-5 at 6 (emphasis added).  Likewise, the delinquent contributions policy states that a lawsuit shall commence "in the event [the defendant] fails to pay the [amounts due] by the end of 15 calendar days after the [Fund's attorney] sends the demand letter."  ECF No. 28-6 at 4 (emphasis added).

Express conditional clauses like these on the face of the documents demonstrate an intent to create conditions precedent to filing suit.  See Royal Bank of Can. v. Beneficial Fin. Leasing Corp., No. 87 Civ. 1056 (JMC), 1992 WL 167339, at *5 (S.D.N.Y. June 30, 1992) ("The parties may . . . create a condition by drafting provisions which use the words 'such as, if, on condition that, subject to, and provided,' which as a general rule demonstrate an intent to make an express condition precedent." (quoting John D. Calamari & Joseph M. Perillo, The Law of Contracts § 11-7 (3d ed. 1987)); Restatement (Second) of

Contracts § 226 cmt. a (noting that, although "[n]o particular form of language is necessary to make an event a condition, . . . such words as 'on condition that,' 'provided that' and 'if' are often used for this purpose").  The conditions expressed in these provisions contemplate at a minimum that a lawsuit will not commence until after a letter is sent by the Fund's attorney to the defendant and a time period set forth in the letter expires.  And, no other language in the relevant documents indicates an unconditional right to file suit or suggests the provisions operate as a condition precedent to some other action.

The defendant argues that there remains a genuine factual dispute regarding whether the letters described in the procedure and policy were sent to the defendant.  The court agrees.  The defendant has presented evidence, including an affidavit from its controller, the appeal letter it submitted to the Fund, and a certified mail receipt, that could support a finding that it never received any notice of its delinquency from the Fund or the Fund's attorney, in part because the Fund never sent them to the correct address.  See ECF No. 100-2 at 1, 4, 6.[11]  The plaintiffs meanwhile have submitted evidence,

---

[11] The plaintiffs have filed a motion in limine to exclude evidence that the Fund's attorney did not send the letters.  See

including copies of letters and answers to interrogatories, that could support a finding that the Fund sent some of the required letters to the appropriate address.  <u>See</u> ECF No. 28-7 at 8–25; ECF No. 98-3 at 5–6.  Because there remains a genuine factual dispute regarding whether the letters were sent to the defendant, the plaintiffs are not entitled to summary judgment on their interest claim.[12]

> (4)   Appeal-related defenses (Nos. 21, 22, 23, 24, and 25)

In these defenses, the defendant argues that the Fund's attorney's conduct during the appeal the defendant pursued with the Fund precludes liability with respect to the plaintiffs' claims for interest and attorney's fees.[13]  In his affidavit, the defendant's controller states that, after

---

ECF No. 115.  The court declines to address the motion in this order.

[12] The defendant also raises estoppel and impracticability defenses based on the lack of notice.  Because the court has already determined that the genuine dispute regarding a lack of notice precludes summary judgment under the defendant's condition-precedent argument, the court need not address the estoppel and impracticability defenses at this time.

[13] The defendant also asserts that the Fund's attorney's conduct precludes liability on the plaintiff's liquidated-damages claim.  Because the court has already determined that the defendant is entitled to summary judgment on that claim, the only issue here is the effect the attorney's conduct has with respect to the claims for interest and attorney's fees.

learning of the assessments against the defendant, he contacted the Fund's attorney, who advised him that, if the defendant appealed the assessments, the attorney "could resolve the matter and avoid a legal battle" that the attorney believed the Fund was not likely to win.  ECF No. 101-2 at 2.  The controller further states that the Fund's attorney advised him on what arguments to raise in the appeal and that he relied on the advice in submitting the appeal to the Fund.  See id.

The defendant argues that, based on the Fund counsel's actions, the Fund should be equitably estopped from pursuing its interest claim.  The plaintiffs assert that the defendant's argument fails under West Virginia's doctrine of equitable estoppel:

> there must exist a false representation or a concealment of material facts; it must have been made with knowledge, actual or constructive of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice.

Cleaver v. Big Arm Bar & Grill, Inc., 502 S.E.2d 438, 439 (W. Va. 1998) (quotation marks omitted).[14]

---

[14] The defendant does not contest this understanding of the doctrine, and the court notes that it generally accords with the common law.  See, e.g., Olson Distrib. Sys., Inc. v. Glasurit Am., Inc., 850 F.2d 295, 296 (6th Cir. 1988) (citing, inter alia, 1 Samuel Williston, The Law of Contracts § 139 (3d ed. 1957)); Pierre J. LeLandais & Co., Inc. v. MDS-Atron, Inc., 543

The court agrees with the plaintiffs.  Assuming the defense is otherwise available, the defendant has presented no evidence or argument that it has been prejudiced by the controller's reliance on the Fund's attorney's advice.  It asserts only that, "[i]n reliance" on the advice, it "filed an appeal and did not take other actions to protect its rights."  ECF No. 100 at 16.  But the defendant does not explain how the appeal was detrimental or prejudicial or identify what "other actions" it would have taken.  To the extent the defendant argues that the plaintiff is not entitled to summary judgment on the interest claim based on the Fund's attorney's actions, the court rejects the argument.

The defendant also argues that the Fund's attorney's actions implicate the reasonableness of the attorney's fees the plaintiffs seek to recover.  The defendant contends that, absent the attorney's advice, the matter may have resolved earlier, avoiding the fees incurred in this litigation.  As the court see it, this argument concerns the amount of fees that would be reasonable if the plaintiffs establish that the defendant is liable for them.  But the plaintiffs have only moved for summary

---

F.2d 421, 424 (2d Cir. 1976) (citing <u>inter alia</u>, Restatement (Second) of Contracts § 90).

judgment on the issue of liability, not recovery amount.  The
argument is misplaced.

        In any event, under the trust agreement, the
plaintiffs' entitlement to attorney's fees depends on their
entitlement to interest, which they have not demonstrated at the
summary-judgment stage.  See ECF No. 28-4 at 48-49 (obligating
employers to pay attorney's fees as a "necessary expense of
collection incurred" by the Fund); see also Idaho Plumbers, 875
F.2d at 218 (holding provision that awards "fees incurred in the
collection process" "does not apply" when the employer "owed
nothing").

        (5)  Different-procedures defense (No. 28)

        In this final defense, the defendant notes that the
language in the delinquent employer procedure differs from the
language in the delinquent contributions policy and suggests
that the difference "may serve as a defense to some of the
alleged delinquent contributions."  ECF No. 100 at 17.

        The defendant asserts that the language of the
delinquent employer procedure does not clearly allow the Fund to
recover attorney's fees related to the collection of liquidated
damages and interest.  In the court's view, this argument again

related to the potential recovery amount rather than to
liability.

The defendant also asserts that, under the terms of
the trust agreement, only the trustees, and not the Fund, may
seek all or part of the attorney's fees that the plaintiffs
pursue.  The court has previously rejected this argument.

In sum, the plaintiffs are not entitled to summary
judgment on any of their claims.

### IV.  Conclusion

For the foregoing reasons, it is ORDERED that:

1. the plaintiffs' motion for partial summary judgment
   (ECF No. 98) be, and it hereby is, denied;

2. the defendant's motion for summary judgment (ECF No.
   101) be, and it hereby is, granted in part and
   denied in part;

3. the plaintiff's motion for leave to file a sur-reply
   (ECF No. 108) be, and it hereby is, denied as moot;[15]
   and

---

[15] The court reviewed the proposed sur-reply the plaintiffs
submitted along with their motion and has concluded that it

4. the plaintiffs' claim is dismissed to the extent it

   seeks liquidated damages and attorney's fees

   incurred in relation to collecting liquidated

   damages.

The Clerk is directed to transmit copies of this

memorandum opinion and order to all counsel of record and any

unrepresented party.

ENTER: September 24, 2020

John T. Copenhaver, Jr.
Senior United States District Judge

---

would not alter the analysis set forth in this memorandum
opinion and order.